EDWARD STETSON, and others,

*vs.*

SPRAGUE ADAMS, and others.

Piscataquis.    Opinion January 3, 1898.

*Deeds.   Monuments.   Plans.*

Of monuments in deeds. The lines of a survey, if ascertainable, govern plans.

It is well settled in this state that a survey once placed upon the face of the earth must control a plan that is made from it, although the plan when placed upon the earth would locate the line elsewhere.

The plaintiffs and defendants were owners of adjoining townships, and the controversy was over the dividing line between them. The plaintiffs contended that it should be located where the plan by which these townships were conveyed would locate it when placed upon the face of the earth. The defendants contended that the line was not where the plan would now locate it, but where it was in fact located by an actual survey from which the plan was made, and the jury found in favor of the defendants' contention. Upon a motion for a new trial, *held;* that the law makes the line where the survey marked it upon the ground; and therefore the verdict ought not to be disturbed.

Exceptions to a refusal of the court to give instructions to the jury, substantially declaring a doctrine adverse to the rule laid down above, will be overruled.

ON MOTION AND EXCEPTIONS BY PLAINTIFFS.

This was a real action tried to the jury in Piscataquis County and involved the question of the division line between township 4, range 8, and township 4, range 9. The jury returned a general verdict for the defendants and also, under the direction of the court, made the following special findings:—

QUESTIONS FOR THE JURY.

1. Did Samuel Weston, acting under his instructions from the committee for the sale of eastern lands in 1794 run or cause to be run upon the surface of the earth a line across the territory within the east and west boundaries of the two townships four, as and for the range line betweeen range 8, and range 9?

Answer, Yes.

2. From all the evidence in this case, does it appear to the jury where across said territory, the said western line, if any, was run?

Answer, Yes.

3. At what distance from the present north line of the ninth range (measuring south on the west line of township four in said range) did the said western line cross the west line of township four in said range?

Answer, Five miles two hundred and ninety-five rods.

(Plaintiffs' exceptions.) The plaintiffs' counsel requested the justice presiding to give to the jury the following instructions which were not given except as appears in the charge itself.

First: The rule that monuments govern is not however inflexible, but like other rules it must yield to exceptions. The only reason given, or which can be given, why monuments are to control the courses and distances in a deed is that the former are less liable to mistakes. If then it appears that no mistakes can reasonably be supposed to have been made in this case, no reason remains for the application of the rule.

Second: Where lines are laid down on a map and plan, and are referred to in a deed of land, the courses, etc., on such plan are to be regarded as the true description of the land as if they were expressly recited in the deed.

Third: Line to be run straight unless otherwise described.

Fourth: Monuments govern only when certain or can be made so.

Fifth: As the deeds of the plaintiffs and the deeds of the defendants both called for and referred to the Rose & Holman plan, which plan was made by the authority of the Legislatures of the Commonwealth of Massachusetts and the State of Maine, under the Act of Separation, through the services of the commissioners specially appointed by the Legislature of said States to make a plan and report as to where the dividing lines between ranges 8 and 9 were north of the Waldo patent, the decision of said

commissioners, appointed by said Legislature in ascertaining, determining and marking upon the face of the earth the common line between townships in the 8th and 9th ranges north of the Waldo patent, is conclusive as shown by the plan and report of such commissioners and the line actually adopted by them.

Sixth: If the line run from the million acre purchase to the Penobscot River or so far as it was run from the million acre purchase toward the river by O'Niel was never adopted by Weston as the true line on the face of the earth as dividing the 8th and 9th ranges north of the Waldo patent, then the spots made by O'Niel in 1794 on the line he, O'Niel, run, are of no binding force, and the plaintiffs are entitled to recover in accordance with the line laid down on the Weston plan of 1794 and referred to in his letter of May 1st, 1801, and in accordance with the line adopted by Rose & Holman in their report and plan made under the Act of Separation in 1822.

The case is stated in the opinion.

Among other instructions to the jury touching the evidence arising from surveys and plans the presiding justice said:—" A man may have a lot of land and lay it out with a surveyor, running lines, laying out streets, putting down stakes, making roads and parks, and then afterwards endeavor to make a plan of them from what has been done. It is a picture of what has been done. Now the plan is the picture, it is the guide, it is the finger-post; but what controls is what was done really upon the surface of the earth, the lines as they were run, the stakes as they were put down. The bounds as they were made are the controlling bounds, even though they may vary from the plan, and even though the plan may have been accurate in locating them. What is the reason of this? It is for certainty, gentlemen, in order to have certainty in regard to boundaries; that they be not continually changing; that there shall not always be disputes arising as to where they are. Where the boundaries are first, especially where the lines are first run, there they stay. You see at once, taking this tract with your knowledge of affairs, that it would be almost a

miracle if two men should start at different times to run a line across a broken country, through a forest, and should run exactly the same course and make the same distance. A third surveyor might go on and try it, and he would perhaps make the distance a little longer or a little shorter or a variation in the course; so that we cannot have and the law does not permit that there shall be a continual running or re-running of lines, but says where it is first run, if that can be found, that shall stand, and all subsequent purchasers must be bound by that. Plans are very useful in showing us what was done, but they are only evidence and not conclusive. The real question is, if there was a previous work, where was that work done? But, gentlemen, I should say this, I think, that sometimes we may be satisfied that the plan was intended to represent, and does represent, what was done before; that it represents lines that were actually run; but we find it impossible to now tell where they were run;—all the marks, all the evidence, everything has been swept away, and we do not have enough to indicate to us anything about where it was run, and we cannot tell. It does not appear where it was run; we are without information. Now in such cases, gentlemen, we must do the best we can. All we have left is the plan, and the plan must then control. We must act as if nothing had been done at all, and endeavor ourselves to take the plan and run out a new line, the old one, if there was one, having completely disappeared. In such case the first line afterward run is the controlling line.

. . . . If nothing had been done before the plan was made, and, if the plan was to indicate only what is to be done hereafter, or after the plan was made, and we were now to do it for the first time, as the plaintiffs contend, then it is conceded, I believe, that a line midway between the north line of the ninth (9th) range and the south line of the eighth (8th) range would be south of the line in dispute and would throw this land into plaintiffs' township. But, gentlemen, defendants contend that the plan indicates that it was made from surveys theretofore made, and, as I have said, I think the evidence will compel us to so find. Then the question is, can we find out what surveys were theretofore made, and can

we find out where they were made across this township, if they were made? We have evidence in this case of a survey made by one Samuel Weston in 1794. It is conceded, I believe, that Samuel Weston had instructions from the committee of Massachusetts. You may remember that the Commonwealth of Massachusetts had a committee appointed having entire charge of eastern lands, and under its direction surveys were made and lands sold. It is conceded, I believe, that Samuel Weston, by a commission dated May 1, 1794, was directed to proceed to this territory and to lay off three ranges between the east line of the Million Acres and the Penobscot river, north of the Waldo Patent, and he was instructed by that, as you will see, to lay off the three ranges and to run out the range lines and the township lines. It is conceded, I also understand, that he in fact did, not personally going over the ground himself, but through his agents and employees, he being the managing man and having authority, of course, to appoint others under him, cause to be run under this commission a line from the Million Acres to the Penobscot river, now known as the north line of range nine (9); that he did that through his brother. It also, I think, is conceded that he did run a line from the Million Acres to Penobscot river now known as the south line of range eight (8), and also that he ran, or caused to be run, more or less of the lines between the townships; that he ran these, or caused them to be run, on the surface of the earth, actually sent men with the proper instruments over the surface of the earth to run the lines and mark them out upon the surface of the earth. But, gentlemen, did Samuel Weston, under that commission in 1794, run or cause to be run upon the surface of the earth the range line between range nine (9) and range (8), and did he run it, or cause it to be run, on the surface of the earth across township four (4)? Did he run that line, or cause it to be run in 1794 across township four (4), a line as and for the range line between the townships? That will be the first question for you, and, instead of asking you to return a general verdict at first, I shall ask you to answer some questions.

"That line, if run, and if we can tell where it was run, and to-day find where it was run, controls. Therefore, as I have said,

there are three questions: First, was the line run across that township; second, can we now tell where it was run, because, if we cannot, then it is as though never run; and, third, how far from the north line of range nine (9) was that line run?

"I will say again, to make it clear, what I have already said in another connection, that although we may be satisfied that a line was run, yet, if we cannot tell now where it was run, it is as if it never had been run, so far as we are concerned; because the duty of the defendants will be to show not only that it had been run, but to show where it had been run—show us the place. I will consider these questions together largely in going over the evidence.

"Starting with the conceded fact that Weston ran some lines in that neighborhood and that he was there to run out the ranges and the townships, we would look first to his field-notes to see whether or not he ran this range line between eight (8) and nine (9) and where he ran it, that is, what he says he found and what he did in the way of making monuments as he went along; but unfortunately, gentlemen, we have not those field-notes. All we have from Samuel Weston are two documents, first, a plan that he made, and, second, a letter that he wrote in 1801 to the commissioners, or to somebody, in relation to this survey. That is all we have from him. His plan indicates one thing in favor of the defendants, and that is that a line was run, because we find upon his plan a line drawn between ranges eight (8) and nine (9) from the Million Acres to the Penobscot River. That line appearing upon his plan is evidence that a line was run, the presumption being that he put down what he did. On the other hand, gentlemen, it seems to afford a bit of evidence in favor of the plaintiffs, in that it indicates a line which runs parallel with the north line of range nine (9) and the south line of range eight (8), coming out at the river at a place that has been described to you upon the plan where there are three islands marked. But you must understand that the plan is only evidence either way. . . . .

"To resume for a moment, the defendants do not profess to show you any of the old spots of Weston on that township, and they have undertaken to tell you why they would not appear there; but

they say that the existence of the spots to the west of the township and of the spots to the east of the township should show you, not only that Weston did cross that township, but that he crossed in that line,—in a line that would range with the spots on either side. To repeat my illustration, if you had the problem to determine whether a man walked across a piece of bare ice where he left no tracks, if you followed his steps through the snow down to the bare spot, and directly opposite you find his steps in the snow on the other side, defendants argue that you should infer from that that he walked across in that line between the two tracks, and they ask you to infer here that not only did Weston's man cross the tract, but that he crossed it in that line; and they claim that that line is now marked on the west line of the township by a stake that you have heard described.  . . . ."

*J. B. Peaks, P. H. Gillin, C. P. Stetson,* for plaintiffs.

Rose & Holman acting under the authority of the highest tribunal in each state determined that the plaintiffs' township was equal in acreage to the defendants' township, and that the line which they laid down making them equal should be adopted. "Towns are created and their territorial limits defined by the legislature alone and no other authority can change them."  *Westbrook* v. *Deering,* 63 Maine, 231; *Ham* v. *Sawyer,* 38 Maine, 37.

In *Lisbon* v. *Bowdoin,* 53 Maine, p. 324, the court says : "That the validity or efficacy of the proceedings of the commissioners in establishing lines between towns appointed by virtue of the Revised Statutes, chap. 3, § 30, must be determined on the facts appearing in the reports."

If this be true, then every act of Rose & Holman and the commissioners indicate that the plaintiffs are entitled to come down to the line, as we claim it should be, one mile and eleven rods.  If the decision of commissioners appointed under Revised Statutes is conclusive on parties and towns as to the line established by them, the lines established by commissioners appointed directly by an act of the Legislature rests upon even higher ground, their authority is delegated direct.  The authority of commissioners appointed under chap. 3, § 43, Revised Statutes, is secondary.

The notes of the commissioners under the Act of Separation give these townships equal acreage. The field-notes of Holman make them of equal acreage. The return of all the commissioners as appearing in the Laws of Maine for 1822 and 1823 make them of equal acreage, and the plan of Rose & Holman make them of equal acreage. Hence the defendants are precluded by the acts of the commissioners under authority of the Legislature of both states from attempting to hold more territory than they are entitled to hold in accordance with the Rose & Holman plan, and the court should have so instructed the jury. Even if the commissioners erred in ascertaining where the true line was, it is held in the case of *Lisbon* v. *Bowdoin*, supra, quoted in *Bethel* v. *Albany*, 65 Maine, 200, that there is no power to reject it, simply because it may be possible that they may have erred in their judgment in ascertaining the true line.

The sixth requested instruction should have been given to the jury. If Weston never accepted the line as run by O'Niel, the plaintiffs are entitled to recover in accordance with the plan of Weston. It is a well-established principle of law, if an agent or servant of a party does an act outside the scope of his authority, delegated to him by his principal, if the principal does not acquiesce in or accept what his agent or servant has done, that it is an unauthorized act and has no binding force upon any one.

The deeds of the plaintiffs and the deeds of the defendants all refer to the Rose & Holman plan; none of them call for monuments. Where a grant of land is made with reference to a plan, the survey actually made at the time if it can be ascertained is to govern, but if no survey was made or if it cannot be ascertained and no natural monuments marked on the plan upon the line exist, the extent of the line is to be settled by the length of line given on the plan according to its scale exactly measured. *Heaton* v. *Hodges*, 14 Maine, 66. This principle is affirmed in *Chandler* v. *McCard*, 38 Maine, 564; in *Wellington* v. *Murdough*, 41 Maine, p. 281; also in *Erskine* v. *Moulton*, 66 Maine, p. 276.

In the case at bar the familiar principle of law as laid down in *Mosher* v. *Berry*, 30 Maine, p. 83, applies, "that where there is an

overrun of land between certain boundaries made to grantees in severalty without intermediate monuments, that the surplus or overrun is to be equally divided."

*F. H. Appleton, H. R. Chaplin; H. Hudson,* for defendants.

Exceptions: First four requests for instructions not applicable to issues, although true in the abstract. They may all be found in *Davis* v. *Rainsford,* 17 Mass. 207.

Where the facts show that there are two established points and the plan shows a straight line between the two points and there has been no actual survey of the lines between such points, a straight line would be in conformity to law and the plan would govern; but when between two established points a line has been actually run on the surface of the earth, straight or otherwise, which differs from the line as delineated on the plan, the line upon the earth controls and the legal proposition that a line is to be run straight unless otherwise described has no application at all to the question involved.

The fifth request is based upon a false assumption of fact. The deed from the state of Maine to the plaintiffs, was based upon the Weston survey and plan. The Rose & Holman plan is based on the Weston survey and plan. As the Rose & Holman plan was made from what actually existed upon the face of the earth prior to the making of said plan, the law in this state is clearly established that such monuments as were made upon the face of the earth must control, and not the plan. The request, therefore, should not have been given. See cases below.

The principle enunciated in the case of *Williams* v. *Spaulding,* 29 Maine, 112, is the rule of law which we contend governs this case, and in which it was held, that where a plan is made intending to delineate a previous survey and there proves to be a variance between the survey and the plan, and a conveyance is made containing a reference to the plan, the grantee will hold according to the survey. The survey is the original work, and when actually made, in the forests, marked trees designate the lines, corners and numbers of the lots. Each lot is clearly indicated upon the face

of the earth. When the plan is intended to represent this work, but differs from it, the error is to be corrected by reference to the original to which the plan as a copy must yield.

In *Bean* v. *Bachelder,* 78 Maine, 184, the plan was merely a picture. The survey was the substance. The plan was not made to show where the lots were to be hereafter located, or how they were to be hereafter bounded. It was made as evidence of work that had been before located and bounded. The lot actually surveyed, bounded by the lots actually run, was the lot intended to be conveyed. The plan was named in the deed rather as a picture indicating the location and lines of the lot. Still, the actual boundaries rather than the picture boundaries were to be sought for. The picture might not be wholly accurate. See *Ripley* v. *Berry,* 5 Maine, 24. In *Pike* v. *Dyke,* 2 Maine, 216, the court say: "Whatever by this location was included in number 11, passed by that designation: as much as if the exterior bounds of the location had been specified with precision, and with reference to known existing monuments. Where lots have been granted designated by number, according to a plan referred to, which has resulted from an actual survey, the lines and corners, made and fixed by that survey, have been uniformly respected in this state, as determining the extent and bounds of the respective lots. It would be impossible to relax this rule without producing the greatest confusion and uncertainty in almost every part of the country."

This case was cited and approved by the court in *Bean* v. *Bachelder,* 78 Maine, 186. See also *Esmond* v. *Tarbox,* 7 Maine, 61; *Williams* v. *Spaulding,* 29 Maine, 112; *Erskine* v. *Moulton,* 66 Maine, 276.

In *Brown* v. *Gay,* 3 Maine, 129, the court say: "The original locations by the surveyor, as far as they can be found, are to be sustained; and if any variance appears to exist between them and the plan, the locations actually made control the plan."

SITTING: FOSTER, HASKELL, WHITEHOUSE, STROUT, SAVAGE, JJ.

HASKELL, J. Writ of entry tried upon the general issue. The verdict was for defendants, and plaintiffs move for a new trial because it is against law and evidence. Plaintiffs and defendants are owners of contiguous townships, and the controversy is over the dividing line between them. Plaintiffs own township 4 in the ninth and defendants township 4 in the eighth range of townships, said ranges extending west from the Penobscot river to the "Million Acres" on the Kennebec. Range 6 having already been surveyed, Massachusetts commissioned Samuel Weston, in 1794, to survey three ranges north thereof, divide them into townships of six miles square and run and spot the lines. On the 7th of the following November, Weston returned to the secretary's office a plan of his work, showing the line between ranges 8 and 9 to intersect the Penobscot, at "Three Islands." His field-notes have not been preserved. The plaintiffs contend for the range line as shown upon the plan, but the defendants assert that the survey placed it a mile or more further north.

Nothing is more firmly established in this state than that, in such case, the survey must govern when its location can be shown; when it cannot be, then the plan may locate it. *Bean* v. *Bachelder*, 78 Maine, 184.

The controverted range line from the Million Acres to the Penobscot is some sixty miles in length and is or intended to be straight, and appears to have been run from west to east. The western end of the line is not in dispute. The eastern end is. On this line, between the second and third tiers of townships divided by it, east from the Million Acre tract, the evidence discloses two ancient beeches, bearing surveyors' marks. One lay upon the ground and bore a surveyor's seal and 1794. Running south 84° east the growth is old, and not far on, a spot from a spruce was cut out and is produced in court, showing by its age to have been made in 1794. Continuing six miles, the line is well marked, sometimes by ancient spots. A poplar bears surveyors' marks

and there are indications of a north and south line. Continuing on for some four miles ancient spots as well as later ones mark the course where a section from a cedar was cut out and is produced. ·It had four spots upon it of the age of 73, 55, 37 and 31 years, respectively. For nearly a mile farther the old growth remained, and both ancient and new spots mark the line. One was cut from a maple showing 102 years' growth, or as made in 1794. That was within three-quarters of a mile of the Katahdin Iron Works Railroad. From there to the railroad the forest had disappeared and no spots were found. For quite a number of miles further not much remained to bear the ancient mark of a surveyor, although records of more recent surveys were seen. Crossing Schoodic Lake, the marks of surveyors of comparatively recent date, show a line, and a hemlock bore a spot that was cut out and is produced showing a spot made in 1794. Fifty rods further on, a spot was cut from a spruce and produced, made in 1794. Then, across Endless Lake, a spot made in 1794 was cut from a spruce and is produced. Farther on, across east branch of Seboeis, a spot made in 1794 was cut from a beech and is produced. The last four spots were cut east of the township in controversy. The surveyor who cut these spots testifies, that by reversing his course and running north 84° west he struck the two ancient beeches first named, and continuing a short distance found old trees well blazed. He ·cut out a spot from a hemlock, and produced it, made in 1794. In a short distance further on he cut from another hemlock, and produced it, a spot made in 1794. Further on he cut, and produced, a spot made from a hemlock made in 1794, and still farther a yellow birch, well blazed but illegible, and a stone post. Then came old growth and ancient marks clear through in places to the end of the line.

There was more evidence concerning the cross lines of townships, and all the evidence was much more in detail than here given, but only enough has been recited to show its general trend and significance. This territory had never been surveyed before Weston in 1794, and the living records of time, written in nature, tell of work done that year that cannot be ascribed to any other hand

than his.   From the Million Acre tract on a course south 84° east across and far beyond the townships owned by these parties his line had been marked, and has been preserved by nature herself, so there can be no mistake as to where he run his line, although seemingly buried under the moss of a century.   That none of Weston's marks exist upon the line within the limits of the townships owned by these parties, for want of trees old enough to preserve them, or from the destruction of trees upon which they were made, cannot shake the certainty that the well known line, both east and west of them, continues across them, although that section of it may have been lost, and although a continuance of the marked line may not strike the Penobscot at Three Islands, or may not have actually been surveyed further east than the last spot found. The jury cannot be said to have erred in finding the Weston survey to have been placed upon a marked line across these townships.   But the plaintiffs contend that other considerations overthrow any actual survey that may appear to have been made.

I.   Plaintiffs contend that Weston made a mistake in his survey of the line between ranges 8 and 9, and base their contention upon the following facts:—Township 4 in range 7 was granted to Bowdoin college, and some uncertainty having arisen about its north line, that is, the range line between 7 and 8, Massachusetts, in 1801, ordered Weston to make a survey of township 4, range 7, and in his letter of explanation, so far as material to this case, says that he employed his brother to run the north line of range 9, and one John O'Niel to run the south line, that is, the line between ranges 8 and 9, "with particular instructions where to leave the Million Acre line"; that he surveyed from the northeast corner of township 1 in the sixth range up river, marking the corners of townships as he went, to the northeast corner of township one in the ninth range, and awaited the arrival of his brother on the north line of range nine, and that the brother struck the river with his line within six rods of the corner that he had made for him.   He says that he came away before O'Niel reached the river as he met with "so many obstacles from low swampy land and

ponds on the line"; that when O'Niel came down river he gave
"an account of his voyage," and says that "I rather concluded he
had struck the river above my station made for him to come out
at." He says O'Niel was a practical surveyor and a man of ability
and, good understanding, and if anything "rather too nice and
curious to have the work performed just so;" that absolute exact-
ness cannot be expected in so broken a country as that is; that so
many obstacles from ponds with all their arms, legs, inlets and
outlets, swamps, bays, thickets, morasses, mountain cliffs and
gullies in so close a succession render it much more difficult to
close lines that might often be wished for." The line between
ranges 8 and 9 was not re-run, and O'Niel's survey was left as he
made it, striking the river further north than the point fixed for
him to strike. Nevertheless, there was his survey, marked upon
the ground, and there the law makes the line. The re-survey of
township 4 in the 7th range does not move the located lines
between ranges 8 and 9.

II. Plaintiffs contend that Massachusetts, in 1820, re-surveyed
by Greenwood the east half of township 3 range 8, the town next
east of defendants, and conveyed the same accordingly; that the
survey fixed the northeast corner to the south of the Weston line
and where it should have been to strike Three Islands on the
Penobscot. But that does not change the Weston survey, and
does not purport to. It simply puts the Weston plan upon the
earth, puts it where O'Niel did not put it, and therefore cannot
change the location of his survey between other townships. Nor
can the survey by Gilmore of the other half of township 3 in 1831
ordered by the land agent of Maine, change the O'Niel line, any
more than the Massachusetts survey in 1820 can do so. Plaintiffs
contend that O'Niel abandoned his line before he reached the
Penobscot. Suppose he did. The survey, so far as he did make
it, must stand. Weston adopted it. Weston says, in his letter to
Massachusetts in 1801 that O'Niel reached the river and above
the station, so far as he could judge from O'Niel's account, and
excuses the inaccuracy of the result from natural causes, but he
nowhere repudiates the survey.

III. Plaintiffs contend that the survey of Silas Holman in 1822 by authority of the commissioner appointed under the act of separation, providing for a division of lands between Maine and Massachusetts, adopted the Weston plan and must control. The parties took their titles under the Holman plan, which is referred to in their respective deeds. The defendants from Massachusetts in 1834, the plaintiffs from Maine in 1863. The deed bounds the defendants northerly by the plaintiffs' township, and the plaintiffs take township 4 range 9, according to survey and plan " in $\frac{1794}{1822}$ by Weston and Lewis and Holman, surveyors." The plaintiffs must recover, if at all, upon the strength of their own title. That title is according to the survey and plan $\frac{1794}{1822}$ by Weston and Lewis and Holman. The Holman, or Holman & Rose plan, for there is but one, purports to have been made from former surveys made by Massachusetts and by order of the commission in 1822. The only surveys by Massachusetts were Weston's in 1794, and Greenwood's in 1820. The only survey by the commission was Holman's in 1822. The plan was composite. It was compiled from two surveys, so that Weston's survey must stand, unless superseded by Holman's. Was it? Holman surveyed from the northwest corner of one in the eighth to the Penobscot, coming out, not where O'Niel's survey struck the river, but where it ought to have struck it, and if Holman's survey be produced westerly, according to the Weston plan, across township two, it would become coincident with Greenwood's survey between the east half of township three in eight and three in the ninth, and also coincident with the surveys made by Gilmore between the west half of these townships in 1831. At the easterly line of plaintiff's land, all the surveys subsequent to Weston's stopped. None of these surveyors found the O'Niel line, because they did not look north far enough to find it. They supplanted it from the Penobscot westerly across townships one and three only. From there on, Weston's survey, the O'Niel line can be traced to the Million Acres, and that, being the only survey, must stand so long as its location can be found. Of course, this view does not give a straight line from the river to the Million Acres. It is straight to the west line of township three,

and then is set over to the north where O'Niel ran through, and then goes straight westerly to its end. Unless the doctrine that a survey shall govern the plan be overturned, no other solution can be given to this case, so long as the verdict stands fixing the O'Niel line upon the face of the earth.

IV. Plaintiffs have six exceptions, but five and six only have been argued and need only be considered. The fifth is to a refusal of a requested instruction in substance that the Rose & Holman plan is conclusive. Of course it is not, against a former survey, as already stated.

The sixth contains a recital of facts that do not fit the case and was properly withheld. No exceptions as to the conduct of the jury have been allowed, but are waived.

*Motion and exceptions overruled.*